**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) **1 : 1 1 -cr- 0 0 4 2 JMS -KPF** |
| TIMOTHY S. DURHAM, | )                    -01 |
| JAMES F. COCHRAN, and | )                    -02 |
| RICK D. SNOW, | )                    -03 |
| | ) |
| Defendants. | ) |

Cause No. 1:11-cr

## INDICTMENT

The Grand Jury charges that:

## I.      RELEVANT PERSONS AND ENTITIES

### A. Fair Financial Services

1.      Fair Financial Company was a financial services business operating in Northeast Ohio under the name Fair Financial Services ("Fair"). Fair's headquarters were in Akron, Ohio, but it maintained offices in several locations in Ohio, including but not limited to Canton, Medina, Wooster, Cuyahoga Falls, Wadsworth, Ashland, and Millersburg. Fair had operated in Ohio since 1934.

2.      In or about 2002, defendants **TIMOTHY S. DURHAM** and **JAMES F. COCHRAN** purchased Fair through a holding company they owned and controlled called Fair Holdings, Inc. ("FHI").

3.      When **DURHAM** and **COCHRAN** purchased Fair, its primary business was consumer financing. Fair provided financing to businesses by purchasing their customer accounts receivables (or "finance receivables") at a reduced rate. Fair provided

1

businesses with cash that they could use earlier than if they waited to collect the finance receivables themselves, and in return, Fair kept the difference between what it paid the businesses for their finance receivables and what it collected on them.

4.     Fair raised the money it needed to buy finance receivables by selling "investment certificates" to investors.  Investors who purchased certificates were entitled to regular interest payments for a set period, usually from 6 to 24 months.  At the end of the period, investors were entitled to repayment of the principal investment in a single lump sum (a "redemption"), which would retire the certificate.

5.     Fair marketed and sold the investment certificates through its branch offices.  The investment certificates were securities pursuant to 15 U.S.C. § 78c(a)(10).

6.     Fair was required to register the investment certificates with the State of Ohio Division of Securities ("Division of Securities").  In order to register the certificates, Fair was required to submit to the Division of Securities financial information about Fair and a proposed "Offering Circular."  The Offering Circular was required to contain truthful and accurate disclosures about Fair, including (a) risk factors to investors who purchased investment certificates, (b) a description of its business and financial condition, (c) its balance sheet, and (d) its income statement, so that the Division of Securities could make informed decisions in evaluating Fair's proposed sale of investment certificates, and so that investors could rely on the Offering Circular to make informed decisions about whether to buy Fair's investment certificates.

7.     Fair could only register a specific amount of investment certificates.  Once Fair sold the registered amount, Fair was required to submit new registration documents

and an Offering Circular to the Division of Securities to sell additional investment certificates.

8.      Between 2002 and November 2009, Fair raised approximately $200 million from investors through the sale of investment certificates; submitted at least five Offering Circulars to the Division of Securities, including in April 2007, July 2008, January 2009, October 2009, and November 2009; and distributed at least three Offering Circulars to investors, including those dated April 2007, July 2008, and January 2009.

### B.  The Defendants and the Companies They Owned or Controlled

9.      From the time defendants **DURHAM** and **COCHRAN** purchased Fair in 2002 through November 2009, **DURHAM** was the Chief Executive Officer, a member of the board of directors, and responsible for managing all of Fair's financial affairs, including Fair's financial reporting obligations to the Division of Securities and to its investors.

10.     From the time defendants **DURHAM** and **COCHRAN** purchased Fair in 2002 through November 2009, **COCHRAN** was the Chairman of the Board and responsible for Fair's operations and policies.

11.     From shortly after **DURHAM** and **COCHRAN** purchased Fair in 2002 through November 2009, defendant **RICK D. SNOW**, a Certified Public Accountant, was the Chief Financial Officer ("CFO") of Fair.  As CFO, **SNOW** was responsible for maintaining Fair's books and records.  **SNOW** regularly consulted with **DURHAM** and **COCHRAN** about the financial status of Fair, including Fair's revenue and loss records, investment decisions, and the reporting of financial information to the Division of

Securities and to investors.  **SNOW** maintained his principal business operations in Indianapolis, Indiana.

12.     **DURHAM** and **COCHRAN** controlled Fair and FHI through another holding company called DC Investments, LLC ("DCI").  FHI and DCI maintained their principal business operations in Indianapolis, Indiana.  DCI was primarily a holding company for various businesses that **DURHAM** and **COCHRAN** owned or controlled.

13.     **DURHAM** was also an owner of Obsidian Enterprises, Inc. ("Obsidian").  Obsidian maintained its principal place of business in Indianapolis, Indiana.  Obsidian was also primarily a holding company for various businesses that **DURHAM** owned or controlled.  **SNOW** was Obsidian's CFO and responsible for maintaining Obsidian's books and records.

### C. The Victims

14.     Fair sold investment certificates to individual investors living in the state of Ohio.

## II.     THE SCHEME TO DEFRAUD

### A. Overview of the Scheme

15.     Between approximately February 2005, the exact date being unknown to the Grand Jury, through the end of November 2009, **DURHAM, COCHRAN,** and **SNOW,** and others, devised, intended to devise, and executed a scheme to defraud investors.

16.     After **DURHAM** and **COCHRAN** acquired Fair, they changed the manner in which Fair operated and used its funds.  Rather than using the funds that Fair

raised from investors primarily for the purpose of purchasing finance receivables, **DURHAM** and **COCHRAN** caused Fair to extend loans to themselves, to their associates, and to the businesses they owned or controlled, which caused a steady and substantial deterioration in Fair's financial condition. **DURHAM, COCHRAN**, and **SNOW** then deceived and defrauded investors by making and causing others to make false and misleading statements about Fair's financial condition and about the manner in which they were using Fair investor money.

### B. Purpose of the Scheme

17.    The purpose of the scheme was to (a) enrich **DURHAM, COCHRAN**, and **SNOW**; (b) solicit and obtain millions of dollars of investors' funds through false and misleading pretenses, representations and promises; and (c) conceal from the investing public Fair's true financial condition and the manner in which they were using Fair investor money.

### C. The Loans from Fair to DURHAM, COCHRAN, and the Businesses They Owned or Controlled

18.    Shortly after purchasing Fair, **DURHAM** and **COCHRAN** began to alter Fair's business. Instead of using the majority of the money that Fair raised from investors through the sale of investment certificates for Fair's consumer financing business, **DURHAM** and **COCHRAN** began using investor money to make loans to themselves, to their family, friends, and acquaintances, and to businesses they owned or controlled.

19.    **DURHAM** and **COCHRAN** wired Fair investor money to themselves, to their family, friends, and acquaintances, and to the companies that they owned or

controlled through multiple entities connected by lines of credit, including through FHI, Obsidian, and DCI.  Because the ultimate entities that received loans of Fair investor money did not have a direct business relationship with Fair, information about those entities and the loans that they received was kept hidden from investors.

20.     Obsidian and DCI, and the businesses that **DURHAM** and **COCHRAN** owned or controlled through Obsidian and DCI, were among the primary beneficiaries of the loans.  **DURHAM** and **COCHRAN** loaned money through Obsidian and DCI to a variety of struggling businesses and start-up ventures, including a car magazine, restaurants, a surgery center, trailer manufacturers, internet companies, a race car team, a replica vintage car manufacturer, a rubber reclaiming plant, and a luxury bus leasing business.  After receiving loans from Fair, many of these businesses failed and were never able to repay the money they borrowed, while others, with the benefit of continued loans from Fair, struggled as unprofitable entities for years.

21.     In addition to the loans that they made through DCI to their struggling businesses and to their family, friends, and acquaintances, **DURHAM** and **COCHRAN** took loans of Fair investor money for themselves through lines of credit with DCI. **DURHAM** and **COCHRAN** used a significant portion of the proceeds of these loans to maintain their lifestyles and to pay for personal expenses.

22.     The loans that **DURHAM** and **COCHRAN** made to businesses that later failed and were never repaid, and the regular infusions of Fair investor money used to support **DURHAM** and **COCHRAN's** lifestyles, personal expenses, and the businesses they owned or controlled, caused Fair's financial condition to steadily and substantially deteriorate.

6

### D. <u>Firing Fair's Accountants and Using Unaudited Financial Statements</u>

23.     From in or about February 2005 through in or about June 2005, Fair's accountants ("Accounting Firm A") told **DURHAM**, **COCHRAN**, and **SNOW** that the lack of repayment on the loans that they had made with Fair investor money, the continued extensions of loan maturity dates, the frequent alteration of loan terms, and the deteriorating condition of the businesses that received loans indicated that many of the loans (a) were not arm's length transactions, (b) were impaired, and (c) had insufficient collateral.

24.     In or about June 2005, after **DURHAM**, **COCHRAN**, and **SNOW** failed to convince Accounting Firm A that they had properly accounted for the loans they had made with Fair investor money, **DURHAM**, **COCHRAN**, and **SNOW** terminated Accounting Firm A and hired a second set of accountants ("Accounting Firm B").

25.     From in or about June 2005 through August 2006, Accounting Firm B told **DURHAM**, **COCHRAN**, and **SNOW** that because it was doubtful that Fair could collect on many of the loans that they had made with Fair investor money and because interest payments on those loans had rarely being made, they would need to be supported by collateral.  While Accounting Firm B initially found that **DURHAM** had sufficient collateral consisting of his own stock and other personal property to support the non-performing loans they had identified for prior years, in or about March 2006, Accounting Firm B told **DURHAM**, **COCHRAN**, and **SNOW** that **DURHAM** no longer had sufficient collateral and that the non-performing loans were under-collateralized by millions of dollars.

7

26.     In or about August 2006, after **DURHAM**, **COCHRAN**, and **SNOW** failed to convince Accounting Firm B that the loans were properly valued and sufficiently collateralized, **DURHAM, COCHRAN,** and **SNOW** terminated Accounting Firm B and hired a third set of accountants ("Accounting Firm C"). **DURHAM, COCHRAN,** and **SNOW** hired Accounting Firm C to perform a review but not an audit.

27.     **DURHAM, COCHRAN,** and **SNOW** never released audited financial statements for 2005, and never obtained or released audited financial statements for 2006, 2007, 2008, and through September 2009. Instead, **DURHAM** signed certifications stating that Fair's balance sheet, income statement, stockholders' equity, and cash flows were, to the best of his knowledge, information and belief, true and correct.

28.     With independent accountants no longer auditing Fair, **DURHAM, COCHRAN,** and **SNOW** concealed from investors that Fair's financial condition had substantially deteriorated due to the millions of dollars in non-performing loans that they had made with Fair investor money.

### E.  Concealing Fair's Financial Condition and Fair's Use of Investor Money

29.     First, **DURHAM, COCHRAN,** and **SNOW** made false and misleading representations about Fair's financial condition. Instead of reducing the value of the loans, as recommended by Fair's independent accountants, or writing the non-performing loans off altogether, **DURHAM, COCHRAN,** and **SNOW** falsely represented, in registration documents and Offering Circulars submitted to the Division of Securities and in Offering Circulars distributed to investors, that the loans on Fair's books were assets that could support Fair's sale of investment certificates when they knew in reality that the

loans were (a) worthless or grossly overvalued, (b) producing little or no cash proceeds, (c) supported by insufficient or non-existent collateral to assure repayment, and (d) in part advances, salaries, and lines of credit for **DURHAM** and **COCHRAN**'s personal expenses.

30.     Second, even though Accounting Firm B had required that **DURHAM** either pledge collateral to support the non-performing loans or write the non-performing loans down, after **DURHAM**, **COCHRAN**, and **SNOW** fired Accounting Firm B, **DURHAM** sold most of the collateral he had pledged, rendering those non-performing loans largely unsecured.  In addition, by using some of the proceeds from the sale of the collateral to support **DURHAM** and **COCHRAN's** struggling businesses, **DURHAM** was able to further conceal the true financial health of those businesses from the Division of Securities and investors.

31.     Third, by continually amending the terms of loans, **DURHAM**, **COCHRAN**, and **SNOW** concealed that **DURHAM** and **COCHRAN** and the businesses that they owned or controlled did not have the ability to make payments on their loans to Fair.  When loans were about to mature or had already matured and the entities could not make payments to Fair, **DURHAM**, **COCHRAN**, and **SNOW** amended the terms of the loans by increasing the amount that the entities could borrow from Fair and by extending the time that the entities had to pay Fair back.

32.     Fourth, when the businesses that **DURHAM** and **COCHRAN** owned or controlled failed, **DURHAM** assumed those businesses' loans personally.  **DURHAM**, **COCHRAN**, and **SNOW** then represented in registration documents and Offering Circulars submitted to the Division of Securities and in Offering Circulars distributed to

9

investors that the loans **DURHAM** had assumed were still assets available to Fair even though they knew that **DURHAM** was rarely making payments on his loans.

33.     Fifth, **DURHAM** and **COCHRAN** caused Fair's sales representatives to make false and misleading representations to prospective investors and investors about Fair's business and its use of investor money.  **DURHAM** and **COCHRAN** knew that: (a) they had changed Fair's primary business from purchasing finance receivables to making loans to **DURHAM** and **COCHRAN**, to their family, friends, and acquaintances, and to the businesses that they owned or controlled; and (b) after Fair's financial condition had deteriorated Fair was primarily using investor funds to pay other investors and not to purchase finance receivables.  Nevertheless, they allowed Fair's sales representatives to continue falsely representing to prospective investors and investors that Fair used investor money only to purchase finance receivables.

## F. Concealing Fair's Severe Cash Flow Crisis

34.     When **DURHAM** and **COCHRAN** purchased Fair in 2002, Fair reported debts to investors from the sale of investment certificates of approximately $37 million and income-producing assets in the form of finance receivables of approximately $48 million.  By November 2009, Fair's debts to investors from the sale of investment certificates had increased to approximately $200 million while Fair's potential income-producing assets consisted only of (a) the loans to **DURHAM** and **COCHRAN,** to their family, friends, and acquaintances, and to the businesses that they owned or controlled, which they claimed were worth approximately $240 million, and (b) finance receivables of approximately $24 million.  Because the loans were producing little or no income for Fair, and because the income Fair had from its finance receivables portfolio could not

alone support Fair's obligations to more than 5000 investors holding approximately $200 million worth of investment certificates, Fair did not have sufficient cash flow available to meet its obligations to investors.

35. **DURHAM, COCHRAN,** and **SNOW** concealed from investors Fair's severe cash flow problems.

36. First, **COCHRAN** made false and misleading statements to concerned investors who either had not received principal or interest payments on their certificates from Fair or who were worried about Fair's financial health. **COCHRAN** contacted investors at **DURHAM's** direction and later discussed with **DURHAM** whether the false and misleading statements he had made quelled investor concerns. **DURHAM** also participated with **COCHRAN** in creating the false and misleading statements and discussed with **COCHRAN** additional false and misleading statements that they could give to the Division of Securities if investors reported irregularities at Fair.

37. Second, **DURHAM** requested daily reports on Fair's cash needs in order to limit payments to investors. When Fair did not have enough cash flow to meet its obligations to investors who were owed interest or principal payments on their certificates, **DURHAM** and **COCHRAN** directed Fair's employees not to pay investors the money that Fair owed to them.

38. During Fair's cash flow crisis, **DURHAM** and **COCHRAN** continued to funnel Fair investor money to themselves for their personal expenses, to their family, friends, and acquaintances, and to the struggling businesses that they owned or controlled, all while making continued misrepresentations and misleading statements about Fair's true financial condition and about how they were using investor money.

11

### III.    THE CHARGES

<u>COUNT ONE</u>
**Conspiracy to Commit Wire and Securities Fraud**
**(18 U.S.C. § 371)**

39.    Paragraphs 1 through 38 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

40.    Between approximately February 2005, the exact date being unknown to the Grand Jury, through the end of November 2009, in the Southern District of Indiana and elsewhere, the defendants **TIMOTHY S. DURHAM, JAMES F. COCHRAN** and **RICK D. SNOW**, and others known and unknown to the Grand Jury, did knowingly and willfully conspire and agree with each other and others to commit certain offenses against the United States, namely:

(a) wire fraud, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmitting and causing certain wire communications to be transmitted in interstate and foreign commerce, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343;

(b) securities fraud, that is, to willfully and knowingly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, directly and indirectly, in connection with the purchase and sale of securities, use and employ manipulative and deceptive devices and contrivances in violation of Title 15, United States Code, Sections

12

78j(b) and 78ff(a) and Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme and artifice to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers of Fair's investment certificates.

## PURPOSE OF THE CONSPIRACY

41.    The Grand Jury realleges and incorporates by reference Paragraph 17 of this Indictment as a description of the purpose of the conspiracy.

## MANNER AND MEANS

42.    The Grand Jury realleges and incorporates by reference Paragraphs 18 through 38 of this Indictment as a description of the manner and means of the conspiracy.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its objects and purposes, at least one of the conspirators committed and caused to be committed, in the Southern District of Indiana and elsewhere, at least one of the following overt acts, among others:

43.    On or about December 30, 2006, **DURHAM, COCHRAN**, and **SNOW** caused FHI to amend the terms of its loan made to Obsidian to increase Obsidian's borrowing capacity from FHI and to extend the date that Obsidian had to repay FHI.

13

44.     On or about January 1, 2007, **DURHAM**, **COCHRAN**, and **SNOW** caused FHI to amend the terms of its loan made to DCI to increase DCI's borrowing capacity from FHI and to extend the date that DCI had to repay FHI.

45.     On or about January 8, 2007, **DURHAM**, **COCHRAN**, and **SNOW** caused Fair to amend the terms of its loan made to FHI to increase FHI's borrowing capacity from Fair and to extend the date that FHI had to repay Fair.

46.     On or about February 9, 2007, **DURHAM**, **COCHRAN**, and **SNOW** caused FHI to amend the terms of its loan made to U.S. Rubber, an Obsidian subsidiary, to increase U.S. Rubber's borrowing capacity from FHI and to extend the date that U.S. Rubber had to repay FHI.

47.     On or about February 13, 2007, **DURHAM** caused $250,000 of Fair's money to be wired to FHI so that **DURHAM** could use the funds to remodel his garage.

48.     On or about January 28, 2008, **DURHAM** caused $150,000 of Fair's money to be wired to FHI so that **DURHAM** could use the funds at a casino.

49.     On or about July 9, 2008, **SNOW** caused to be sent by electronic mail an Offering Circular for Fair containing false and misleading statements about its financial condition and the manner in which **DURHAM**, **COCHRAN**, and **SNOW** were using investor money.

50.     On or about July 28, 2008, **DURHAM**, **COCHRAN**, and **SNOW** caused to be sent to the Division of Securities an Offering Circular for Fair containing false and misleading statements about its financial condition and the manner in which they were using investor money.

14

51.     On or about November 10, 2008, **DURHAM** and **COCHRAN** caused $50,000 of Fair's money to be wired to FHI so that **COCHRAN** could use the funds to pay country club fees.

52.     On or about January 16, 2009, **DURHAM, COCHRAN,** and **SNOW** caused to be sent to the Division of Securities an Offering Circular for Fair containing false and misleading statements about its financial condition and the manner in which they were using investor money.

53.     On or about September 11, 2009, **DURHAM, COCHRAN,** and **SNOW** caused a Fair sales representative to make the following false and misleading statements to an undercover agent posing as an investor:

(a) "Basically what we do is we do small business to business loans. So say if you went to, say to ten thousand, just a number. The minimum is two thousand. Um, so you give me a check for ten thousand . . . . In that two year time we would take your ten thousand dollars and we would go to like Craftmatic and we'd say hey look we have ten thousand dollars. We want to buy ten thousand dollars worth of the loans that you've issued. . . . So the ten thousand dollars we give them is up front so they don't have to wait the two years to collect on people that are buying a bed or a year and a half, however long the loans are. But that's basically what we do and then the loans that we do buy are small short term loans that aren't over

three thousand dollars and don't go. . . I think the longest will
go two years that we'll actually do a loan for."

(b) Fair "never missed an interest payment. We've never had any
problems. Like I said, the loans that we do, uh, invest in are
small term so people are more likely to pay a years worth of
twenty dollars a month versus, you know, thirty years of six
hundred dollars for a house."

(c) Fair has been "doing the same thing since 1934."

54.     On or about October 29, 2009, **DURHAM** signed a certification stating
that Fair's balance sheet, income statement, stockholders' equity, and cash flows for 2007
and 2008 were to the best of his knowledge, information, and belief, true and correct.

55.     On or about October 30, 2009, **DURHAM**, **COCHRAN**, and **SNOW**
caused to be sent to the Division of Securities an Offering Circular for Fair containing
false and misleading statements about Fair's financial condition and the manner in which
they were using investor money.

56.     On or about November 9, 2009, **DURHAM** and **COCHRAN** had a
telephone conversation during which they discussed whether they could replace certain
Fair employees while seeking reauthorization from the Division of Securities.
**COCHRAN** stated that they needed to retain the employees regardless of their
competence because "these guys know a little bit too much. They can take it and bust
us." **DURHAM** agreed stating "No. We can't. We've got to get through this."

57.     On or about November 12, 2009, **DURHAM** and **COCHRAN** had a
telephone conversation during which **COCHRAN** discussed falsely telling investors that

**DURHAM** and **COCHRAN** had not used investor money for personal expenditures such as the purchase of houses and cars.

58.     On or about November 12, 2009, **DURHAM** and **COCHRAN** had a telephone conversation during which they discussed an accounting strategy to make millions of dollars of "bad debt loans" that they would otherwise have to disclose to the Division of Securities "literally disappear."

59.     On or about November 13, 2009, **DURHAM** and **SNOW** had a telephone conversation in which they planned to "wipe off" millions of dollars in bad debts so that they would not have to explain or justify the debts to the Division of Securities.

60.     On or about November 17, 2009, **DURHAM** and **COCHRAN** had a telephone conversation during which they discussed how a substantial infusion of Fair investor money "buys us more time" to make interest and redemption payments to existing investors.

61.     On or about November 18, 2009, **DURHAM** and **COCHRAN** had a telephone conversation during which they planned to give a false and misleading explanation to an investor about why the investor could not redeem an investment certificate.

62.     On or about November 18, 2009, **DURHAM** and **COCHRAN** had a telephone conversation during which **COCHRAN** told **DURHAM** that the false and misleading explanation that **COCHRAN** had given to the investor appeared successful. **DURHAM** responded by telling **COCHRAN** "you are the best at this."

63.     On or about November 19, 2009, **DURHAM** and **COCHRAN** had a telephone conversation during which they planned to give another false and misleading explanation to an investor about why the investor could not redeem an investment certificate.  **DURHAM** advised **COCHRAN** to "use the same reason you used yesterday with the other guy" but cautioned **COCHRAN** not to "use that explanation too often because it's not really true."

64.     On or about November 19, 2009, **DURHAM** and **COCHRAN** had a telephone conversation during which they discussed whether investors were going to call the Division of Securities to report payment irregularities at Fair and then discussed false and misleading explanations they could give to the Division of Securities if investors complained.

65.     On or about November 24, 2009, **DURHAM, COCHRAN**, and **SNOW** caused to be sent to the Division of Securities an Offering Circular for Fair containing false and misleading statements about its financial condition and the manner in which they were using investor money.

All in violation of Title 18, United States Code, Section 371.

### COUNTS TWO THROUGH ELEVEN
**Wire Fraud**
**(18 U.S.C. §§ 1343 and 2)**

66.     Paragraphs 1 through 38 and 43 through 65 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

67.     Between approximately February 2005, the exact date being unknown to the Grand Jury, through the end of November 2009, in the Southern District of Indiana

and elsewhere, the defendants, **TIMOTHY S. DURHAM, JAMES F. COCHRAN** and

**RICK D. SNOW**, aided and abetted by each other and others known and unknown to the

Grand Jury, did knowingly and with intent to defraud devise a scheme and artifice to

defraud, and to obtain money and property by means of materially false and fraudulent

pretenses, representations and promises, knowing that the pretenses, representations, and

promises were false and fraudulent when made.

## PURPOSE OF THE SCHEME AND ARTIFICE

68.     The Grand Jury realleges and incorporates by reference Paragraph 17 of

this Indictment as a description of the purpose of the scheme and artifice.

## THE SCHEME AND ARTIFICE

69.     The Grand Jury realleges and incorporates by reference Paragraphs 15

through 16 of this Indictment as a description of the scheme and artifice.

## USE OF THE WIRES

On or about the dates specified as to each count below, the defendants, for the

purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do

so, did knowingly transmit and cause to be transmitted, by means of wire

communications in interstate and foreign commerce, certain writings, signs, signals,

pictures and sounds, as more particularly described below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------------------|-----------------------------------|
| 2 | February 13, 2007 | Wire transmission of $250,000 from Fair in Akron, Ohio to FHI in Indianapolis, Indiana. |
| 3 | January 28, 2008 | Wire transmission of $150,000 from Fair in Akron, Ohio to FHI in Indianapolis, Indiana. |
| 4 | July 9, 2008 | Wire transmission of Offering Circular from |

| | | Indianapolis, Indiana to Columbus, Ohio. |
|---|---|---|
| 5 | November 10, 2008 | Wire transmission of $50,000 from Fair in Akron, Ohio to FHI in Indianapolis, Indiana. |
| 6 | October 30, 2009 | Wire transmission of Offering Circular from Fair Finance in Akron, Ohio to FHI in Indianapolis, Indiana. |
| 7 | November 10, 2009 | Phone call between **DURHAM** in California and **SNOW** in Indiana. |
| 8 | November 18, 2009 | Phone call between **DURHAM** in California and **COCHRAN** in Ohio. |
| 9 | November 18, 2009 | Phone call between **DURHAM** in California and **COCHRAN** in Ohio. |
| 10 | November 19, 2009 | Phone call between **DURHAM** in California and **COCHRAN** in Ohio. |
| 11 | November 19, 2009 | Phone call between **DURHAM** in California and **COCHRAN** in Ohio. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWELVE
### Securities Fraud
### (15 U.S.C. §§ 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; 18 U.S.C. § 2)

70.    The allegations set forth in Paragraphs 1 through 38 and 43 through 65 of this Indictment are realleged as though fully set forth herein.

71.    Between approximately July 2008 through the end of November 2009, within the Southern District of Indiana and elsewhere, **TIMOTHY S. DURHAM,** **JAMES F. COCHRAN** and **RICK D. SNOW**, did willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, use and employ manipulative and deceptive devices and contrivances in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and

20

Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers of Fair's investment certificates, to wit, **DURHAM, COCHRAN**, and **SNOW** made false and misleading representations about Fair's true financial condition and the manner in which they were using Fair investor money.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.

## **FORFEITURE**

1. Pursuant to Federal Rule of Criminal Procedure 32.2, the United States hereby notifies the defendants that it will seek forfeiture of property pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 1956(c)(7)(A), 1956(c)(7)(D), 1961(1), and Title 28, United States Code, Section 2461(c) as part of any sentence imposed.

2. If convicted of any of the offenses set forth in the Indictment, **TIMOTHY S. DURHAM, JAMES F. COCHRAN** and **RICK D. SNOW**, shall forfeit to the United States:

a) any property, real or personal, constituting or derived from proceeds the defendants obtained directly or indirectly as the result of the offenses of which they are convicted; or

b) a sum of money equal to the total amount of the proceeds of the offenses.

The United States will show that the total amount of proceeds obtained by the defendants as a result of the criminal activity alleged herein is two hundred seven million, two hundred forty-six

21

thousand, three hundred and twenty-nine dollars ($207,246,329.00).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in paragraph 2, if, by any act or omission of the defendant, the property described in paragraph 2, or any portion thereof:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty.

In keeping with the foregoing, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of all forfeitable property as described above in Paragraph 2.

A TRUE BILL:



FOREPERSON

TIMOTHY M. MORRISON
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

By: _____
Winfield D. Ong
Assistant United States Attorney

By: _____
Joe H. Vaughn
Assistant United States Attorney

DENIS J. MCINERNEY
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By: _____
Robertson Park
Assistant Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By: _____
Henry P. Van Dyck
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice