UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
|    *vs.* | ) | 1:11-cr-00042-JMS-KPF |
| | ) | |
| TIMOTHY S. DURHAM, | ) | -01 |
| JAMES F. COCHRAN, and | ) | -02 |
| RICK D. SNOW, | ) | -03 |
|    *Defendants.* | ) | |

# ORDER

Presently before the Court is Defendant Timothy S. Durham's Motion to Suppress Evidence Obtained During and as a Result of the Obsidian and Fair Finance Searches. [Dkt. 152.] Mr. Durham's Co-Defendants, James F. Cochran and Rick D. Snow, have joined in the motion only insofar as it argues that "the affidavit submitted in support of the search warrants did not establish probable cause for the issuance of the warrants." [Dkts. 186 at 1; 197 at 1-2.]

## I.
### BACKGROUND

Mr. Durham challenges the search warrant the Court issued for the "principal offices of Timothy S. Durham, and his holding companies, Fair Holdings, Inc. and Obsidian Enterprises," all located in Indianapolis, Indiana. [Dkt. 154.][1] The warrant sought evidence to establish violations of the following criminal statutes: 18 United States Code §§ 1343 and 1956 (wire fraud and money laundering), and 15 United States Code § 78j(b) (securities fraud). The Court will

---

[1] Mr. Durham's motion also purports to challenge the fruits of a search warrant issued in Ohio. [*See* dkt. 153 at 1.] He has not provided the Court with a copy of that warrant, its application, or with any argument specifically addressing the legal and factual circumstances for that warrant (including, for example, an explanation of the extent of his reasonable expectation of privacy there). Those failures constitute a waiver of any argument that he may have had, for lack of cogent development. *E.g.*, *Kawasaki Heavy Indus. v. Bombardier Rec. Prods.*, 660 F.3d 988, 994 n.3 (7th Cir. 2011) (citation omitted).

begin by summarizing the contents of the affidavit that accompanied the warrant application before commenting on the evidence that the Court received in connection with the hearing on the motion.

**A. Affidavit Submitted in Support of the Warrant**

After setting forth his experience and his personal knowledge of the investigation, Special Agent Halliden explained in the affidavit submitted in connection with the search warrant request that he believed that Mr. Durham and Mr. Cochran were operating a Ponzi-type fraud scheme through an Ohio company called Fair Financial Services ("Fair Financial"), with the help of their two Indiana-based holding companies: Fair Holdings, Inc., and Obsidian Enterprises, Inc. ("Obsidian"). [*See* dkt. 154-1 ¶¶ 1-11.]

1. *Background on the Companies*

According to Fair Financial's prospectus (a copy of which was not attached to the affidavit but referenced in multiple places), Fair Financial takes investor money from Ohio residents and uses it in two ways. Fair Financial purchases short-term consumer loans, with an average balance of $1,610. [*Id.* ¶ 12.] The prospectus also discloses that Fair Financial loans money to its parent, Fair Holdings, and other companies controlled by Mr. Durham. [*Id.* ¶ 13.] Mr. Halliden advised:

> In a financial update to the prospectus (single page insert) dated June 30, 2009, loans to Durham, his companies, and other undisclosed creditors were approximately $192 million, which represents nearly 80% of the $241 million in outstanding assets of Fair Finance. Some of the loans do not require payment of any principal or interest until the maturity date of the loan. Loans to undisclosed creditors were approximately $19 million. The unaudited financial statements shown in the prospectus (excluding the June 30, 2009 balance sheet and income statement) have not been updated since December 31, 2007.

[*Id.* ¶ 13.]

As for Obsidian, its website revealed that it had several subsidiaries and affiliated entities, which ranged from a rubber reclaiming operation in Mississippi to National Lampoon. [*Id.* ¶ 15.] In September 2009, two months before Special Agent Halliden's search warrant, the CEO of National Lampoon, Daniel Laikin, "plead guilty to one count of conspiracy to commit securities fraud in a scheme to inflate the stock price of National Lampoon." [*Id.*] Mr. Laikin was a member of Obsidian's board of directors and of Fair Financial's board as well. [*Id.* ¶¶ 9, 16.]

Mr. Durham operated Fair Holdings and Obsidian from his office in Indianapolis, which Special Agent Halliden requested a warrant to search. [*Id.* ¶ 48.]

2. *Mr. Laikin's Proffer*

At a proffer session in March 2009, Mr. Laikin told the FBI that "Timothy Durham has been running a Ponzi scheme via Fair Finance" and that "Fair Finance funds have paid for Durham's extravagant lifestyle and luxury cars," essentially "fund[ing] everything Durham owns … contrary to what has been represented to Fair Finance's investors." [*Id.* ¶ 16.] Furthermore, Mr. Laikin told the FBI that Mr. Durham "is using new investor money to pay redemptions and to prop up Fair Finance and his other business operations," and recently was unable to repay a $250,000 church investor note, which he had to negotiate to repay over time rather than on its maturity date. [*Id.* ¶ 17.] Mr. Laikin refused to cooperate further unless he received a reduction at his upcoming sentencing, which the Government declined to provide. [*Id.*]

3. *SEC Investigation*

Special Agent Halliden's affidavit recounted that he had spoken with a staff attorney at the SEC. It had received information in July and September 2009 that Fair Financial was unable to repay a $200,000 note to an investor when the note came due, instead pressuring the investor to roll over

the note for another term.  [*Id.* ¶ 19.]  The SEC had evidently not heard about the nonpayment of the separate $250,000 note, for it was not mentioned in this part of the affidavit.

    4. *Undercover Investigation*

The FBI had undercover agents contact Fair Financial, pretending to be interested in investing money with the company.  In August 2009, a sales representative explained over the telephone that Fair Financial takes investor money and loans it to the "operations" side of the company—called "Fair Finance"—which in turn lends it out to finance consumer purchases at high interest rates, in excess of 21%.  [*Id.* ¶ 22.]  The representative advised that "Fair Financial is not insured, but it is regulated with the State of Ohio Securities Department and has been in business since 1934.  [The representative also] stated that Fair Financial has never missed a principal or interest payment."  [*Id.*]  That latter statement was, however, inconsistent with the information that Mr. Laikin had provided about the $250,000 note to the church and inconsistent the complaint to the SEC about the $200,000 note to the individual investor

In early September 2009, the undercover agent went to one of Fair Financial's offices, in Ohio, and met with another representative.  [*Id.* ¶ 24.]  Again the representative focused only on the consumer loans, rather than the substantial loans to Mr. Durham's other entities, and repeated that "Fair Financial has been in business since 1934 and has never missed an interest payment and 'we've never had any problems.'"  [*Id.* ¶¶ 24, 27.]  The representative "reviewed the Fair Financial prospectus and financial statements with the undercover agent and stated that a 'lot of it's useless information that you probably won't ever really care to know.'"  [*Id.* ¶ 30.]

In late September, the undercover agent met with the same representative as before, but this time actually bought an investment certificate for $76,278.  [*Id.* ¶ 32.]  The representative

once again explained that Fair Finance focuses on consumer loans, "with approximately 30,000 loans [outstanding] which average $1,500 each." [*Id.* ¶ 33.]

5. *FEDWIRE Data*

According to the affidavit, the FBI subpoenaed FEDWIRE information from the Federal Reserve, which revealed substantial transfers of money between Fair Financial and Fair Holdings, Inc., as well as to other companies affiliated with Mr. Durham. [*Id.* ¶ 42.] Among other things, Special Agent Halliden explained that $20 million went to Mr. Durham's affiliated businesses over a five-year period, including $100,000 to Mr. Durham and $30,000 to Mr. Cochran, personally. [*Id.* ¶ 43.]

6. *Description of Ponzi Scheme*

Special Agent Halliden then summarized the aspects of the companies' operations that he believed were consistent with a Ponzi scheme. For example, although having a prospectus is inconsistent with a Ponzi scheme, having an untruthful one is not. [*Id.* ¶ 43(2).] "The Fair Finance prospectus is unaudited and has not been updated since December 31, 2007 (excepting for the recent unaudited income statement and balance sheet)." [*Id.*] Fair Financial offered very high rates of return to attract investors; "[t]he undercover agent purchased a six-month note investment certificate paying 7.75% per annum" when FDIC CDs were averaging 1.24%. [*Id.* ¶ 43(3).] And the outdated prospectus indicates "35 separate loans to Durham, his associates, and businesses, totaling approximately $144 million. Some of the loans do not appear to require payment of interest or principal. Virtually all of the loans are collateralized by 'all assets of borrower' and 'guaranteed by a stockholder of the borrower,'" with no discussion in the prospectus about their ability to make good on the loans or guarantees. [*Id.* ¶ 43(5).]

7. *Wire Tap*

Based on the foregoing allegations, Special Agent Halliden's affidavit for the search warrant reported to the magistrate judge that Judge Barker had recently approved a wiretap on Mr. Durham's cell phone. [*Id.* ¶ 46.] Among the calls that the wiretap had captured was one in which Mr. Durham told Mr. Cochran "that they have $100 million in unsecured debt with 'nothing to support it.'" [*Id.* ¶ 47(C).] In another, Mr. Durham and Mr. Cochran discussed their pending request from the State of Ohio to issue additional investor certificates, and "how to manipulate their finances to make their situation appear better to the state. Cochran says, 'if they're going to blow us up we'll blow them up.' They also discuss how to make '$25-28 million in loans vanish.'" [*Id.* ¶ 47(E).] In another call, Mr. Durham "says their financial reporting 'may be nonsensical to you and me,'" but that it makes sense to their lawyer. [*Id.* ¶ 47(I).] And in another, Mr. Cochran "expresses concern that they could go to jail for their conduct." [*Id.* ¶ 47(L).]

8. *Court Approval*

Based on the affidavit, the magistrate judge issued a search warrant. The warrant authorized the seizure of Fair Holdings' and Obsidan's computers, mail, bookkeeping records, and other similar items. [*Id.* at Attachment B.] The warrant was issued to uncover potential evidence of wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and securities fraud (15 U.S.C. § 1956).

**B. Evidentiary Hearing**

The Court permitted Mr. Durham an evidentiary hearing on his multiple pending pretrial motions. [*See* dkt. 262.] At the hearing, Special Agent Halliden testified credibly, making appropriate concessions. For example, he indicated that Mr. Laikin himself did not use the word "Ponzi scheme" with respect to Fair Financial, rather Mr. Laikin's lawyer did in proposing the

proffer session. As to the facts asserted by Mr. Laikin to support the Ponzi scheme conclusion, Mr. Halliden remained constant. The Court finds as a matter of fact that Special Agent Halliden in good faith believed that probable cause existed for the search warrant and that he had provided the magistrate judge all relevant information, based upon his knowledge, training, experience, and investigation. Special Agent Halliden did not intend to mislead magistrate judge.

## II.
### DISCUSSION

According to the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Here, Mr. Durham claims that the searches of Fair Holdings and Obsidian violated his rights under the Fourth Amendment in several respects. First, he claims that the warrant applicant and supporting affidavit contained material misstatements and omissions. Second, he says that the statements in the affidavit, true or not, fail to establish probable cause. Third, he complains that the warrant lack sufficient particularity. Finally, he argues that the execution of the warrant was unconstitutionally unreasonable.

**A. Challenge to the Warrant Application**

A defendant may suppress evidence obtained pursuant to a search warrant if the defendant can establish that material averments in the affidavit submitted to obtain the warrant were either deliberately false or else made with a reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). An averment is only material if the affidavit would not otherwise permit a finding of probable cause without it. *Id.* Probable cause for a search exists when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the be-

lief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (citation omitted). "The affidavit [for the search warrant] need only allege specific facts establishing a reasonable probability that the items sought are likely to be at the location designated; the affidavit need not also negate every argument that can be asserted against that probability." *United States v. Rambis*, 686 F.2d 620, 623 (7th Cir. 1982) (citation omitted). Furthermore, even "doubtful cases should be resolved in favor of upholding the warrant." *Id.* (citation omitted). Given the high standards for setting aside a search warrant, few challenges succeed. *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) (calling the elements "hard to prove").

Before turning to the portions of the search-warrant affidavit that Mr. Durham challenges, it is important to note the portions that he does not challenge. According to the unchallenged portions of the affidavit, Fair Financial was loaning the majority of the moneys it was receiving from investors to companies affiliated with Mr. Durham, and some loans did not require the payment of any principal or interest until their maturity dates. [Dkt. 154-1 ¶ 13.] Mr. Laikin—a member of the board of directors—told the FBI that Fair Financial was beginning to have problems repaying investors and that Mr. Durham was using investor money to fund his own lifestyle, in contrast to what investors were being told. [*Id.* ¶¶ 16, 17.] Additionally, the SEC had received a information that Fair Financial was unable to repay two notes to investors when they came due. [*Id.* ¶ 19.] A sales representative, however, told an undercover agent that "Fair Financial has never missed a principal or interest payment" on its notes. [*Id.* ¶ 23.] Another sales representative told the undercover agent: "Fair Financial has been in business since 1934 and has never missed an interest payment and 'we've never had any problems'." [*Id.* ¶ 27.] Those unchallenged averments collectively suffice to establish probable cause to believe a search would

uncover evidence of wire/securities fraud or money laundering. All the other averments, therefore, were immaterial—even if successfully attacked—and thus incapable of permitting an order of suppression, *Franks*, 438 U.S. at 171.

As it turns out, Mr. Durham's challenges to the averments in the affidavit, or the affidavit's omissions, cannot prevail here: Special Agent Halliden did not intentionally make false statements and omissions in his application, nor did he recklessly disregard the truth. Although the Court rejects all of Mr. Durham's arguments as unmeritorious, the Court will specifically discuss only his main points. *United States v. Swanson*, 210 F.3d 788, 791 (7th Cir. 2000) (discussing only main arguments against affidavit for warrant and summarily rejecting the rest as insufficient to establish intentional or reckless misstatements).

First, Mr. Durham essentially argues that innocent explanations exist, in proper context, that would undermine the seemingly powerful evidence in favor of probable cause. For example, Special Agent Halliden's affidavit reported that Mr. Durham and Mr. Cochran were overheard on a wiretap "discuss[ing] how to make '$25-28 million in loans vanish [from the financial statements],'" and that Mr. Cochran worried to Mr. Durham on another wiretap "that they could go to jail for their conduct." [Dkt. 154-1 ¶ 47(E), (L).] As for the former, Mr. Durham says that because an earlier wiretap shows that he had previously told another individual to include the loans on the balance sheet being submitted to state regulators, this call was really about legitimate loan write offs. [Dkt. 153 at 11.] As for the second wire tap, about possible jail time, Mr. Durham says that the conversation is inconsistent with a consciousness of guilt because he told Mr. Cochran "no …. [y]ou can't go to jail for taking real estate loans," [dkt. 153-31 at 7], and because Mr. Cochran said that he thought that they had adequately disclosed their financial activ-

ities—at least to the "old regime" of state regulators, [dkt. 153-31 at 7]—such that the state would not shut down the company, [dkt. 153 at 17-18].

While the jury at trial might find those explanations persuasive enough to establish reasonable doubt, Mr. Durham's "context" arguments fail, however, to rise to the level of intentional or reckless misconduct. Furthermore, as indicated above, a search warrant application need not disprove all potentially innocent explanations. *Rambis*, 686 F.2d at 623 (citation omitted). *See also United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged … does not negate probable cause.") (cited with approval by *United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990)). To the extent that the affidavit disclosed potentially mitigating evidence, the magistrate judge was not required to treat the search warrant as a motion for summary judgment and draw all inferences in Mr. Durham's favor. *See Johnson v. United States*, 333 U.S. 10, 13-14 (1948) ("The point of the Fourth Amendment … is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). To whatever extent that the affidavit omitted the context that Mr. Durham relies upon here, nothing hints at anything more than potential negligence (and maybe not even that). "But a little negligence—actually even a lot of negligence—does not [a successful challenge to a warrant application] make." *Swanson*, 210 F.3d at 791.

The next category of argument that Mr. Durham makes involves the definition of a Ponzi scheme. He says that Ponzi schemes have a defining characteristic: "investor money is never actually invested." [Dkt. 153 at 5 (citing SEC and FBI websites).] And because the affidavit

discloses that Mr. Durham was investing the money—in loans to companies that Mr. Durham controlled—Mr. Durham says that the affidavit falsely accused Mr. Durham and Mr. Cochran of operating a Ponzi scheme. [*See id.*]

Mr. Durham's arguments about the formal definitions of Ponzi schemes are, however, a red herring. The warrant at issue permitted a search for evidence of wire fraud, securities fraud, and money laundering—not a Ponzi scheme whatever the definition. Among other things, intentionally investing others' money in loans to corporate executives (or companies they control) that the executives would be unable to repay can constitute such a violation, particularly for the low standard that probable cause imposes. *See, e.g.*, *Lewis v. Straka*, 535 F. Supp. 2d 926, 929 (E.D. Wis. 2008) (denying motion to dismiss securities-fraud action where, among other things, the company "often extended rather than wrote off large nonperforming loans" and its executive "engaged in self-dealing, obtaining loans for himself and his family at favorable rates"). In any event, while "technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in [judicial review of warrant affidavits]," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), Chief Judge Easterbrook has explained that "Ponzi schemes must grow in order to survive, and there always comes a time when growth cannot be sustained." *Peterson v. McGladrey & Pullen, LLP*, ___ F.3d ___, 2012 U.S. App. LEXIS 6608, *3 (7th Cir. 2012). Mr. Laikin's proffer to the FBI that Fair Financial was "using new investor money to pay redemptions and to prop up Fair Finance and his other business operations" reasonably suggested to the FBI that such a scheme existed and that the breaking point had arrived. To whatever extent that Special Agent Halliden erred in his understanding of a Ponzi scheme, which was not the specific crime under investigation, he set forth his understanding for the magistrate judge to consider, further demonstrating his good faith.

Mr. Durham also argues that that the inaccuracies in the oral representations from sales people to the undercover agent cannot support probable cause as to him. [*See* dkt. 153 at 6.] But "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) (footnote omitted). It does not matter, therefore, whether Mr. Durham can be connected to the statements. The warrant allowed the search of property controlled by Mr. Durham, not an arrest of Mr. Durham. The agents who made the misrepresentations were agents of the companies whose premises were subject to search. And to the extent that he relies upon civil securities law to argue that no securities fraud can obtain for oral misrepresentations if the written prospectus accurately described the investment, the Court notes that Mr. Durham makes no such argument about wire fraud and money laundering, the other two crimes at issue in the search warrant. [*See* dkt. 199 at 3-4.]

Finally, as for his argument that the search warrant should fail because Special Agent Halliden did not attach the offering circular to his affidavit, the Court rejects that argument, too. Special Agent Halliden summarized what he believed were the relevant portions of it. And while a more complete application might have included it, the omission was in good faith and, at worst, negligent. Thus, it cannot justify suppression. Additionally, the Court notes that the magistrate judge could have requested the prospectus if the magistrate judge believed that seeing the actual text would assist in the probable-cause determination.

Given the low threshold for probable cause, Mr. Durham's objections "amount to little more than throwing pebbles at a tank." *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000).[2] The Court, therefore, rejects them.

### B. Sufficiency of the Four Corners of the Affidavit

Although Mr. Durham also argues that the four corners of the affidavit do not establish probable cause, the Court has already held, above, that the unchallenged pieces of the affidavit themselves establish probable cause. Accordingly, his challenge to the four corners of the affidavit necessarily fails, even before the Court does, as it must, afford "great deference" to a magistrate judge's determination of probable cause, *Spinelli v. United States*, 393 U.S. 410, 419 (1969) (citation omitted). Furthermore, good-faith reliance on a facially valid warrant precludes suppression. *United States v. Leon*, 468 U.S. 897, 923 (1984).

### C. Particularity Challenge

To comply with the Fourth Amendment, a warrant must "describe the objects of the search with reasonable specificity," a flexible standard that does not require "elaborate[] detail." *United States v. Somers*, 950 F.2d 1279, 1285 (7th Cir. 1991) (citations omitted). Mr. Durham complains that the magistrate judge's search warrant authorized the seizure of all the computers on the location, even those not specifically identified with potential criminal activity. That challenge cannot succeed, however, because the crux of the affidavit was that the entire enterprise was a fraud. *United States v. Bentley*, 825 F.2d 1104, 1110 (7th Cir. 1987) ("When the whole business is a fraud, the warrant properly may permit the seizure of everything the agents find." (citation omitted)). So the magistrate judge was authorized to order the seizure of the computers and other records. To the extent that the magistrate judge erred, the FBI reasonably and in good

---

[2] Of course, the jury at trial will have to confront them through the prism of reasonable doubt, a much more exacting standard.

faith relied on a facially valid warrant to seize them; therefore, suppression is not authorized. *Leon*, 468 U.S. at 923.

### D. Challenge to Execution

Mr. Durham also makes one last objection to the search: "The execution of the search warrant was unreasonable." [Dkt. 153 at 22.] The basis of the objection is not entirely clear; Mr. Durham does not develop the argument very much in his opening brief. And because he entirely omits mention of it in his reply brief, the Court deems the argument abandoned.

The objection does, however, fail on the merits, too. To the extent that Mr. Durham contends that the FBI seized more than authorized by the warrant, the Court rejects that claim as a matter of fact given his failure to adduce evidence to support it. To the extent that he contends that the warrant authorized the seizure of items unrelated to the crimes under investigation, the Court rejects that claim as a matter of fact given his failure to show that the agents were not acting in good faith when they reasonably relied on a facially valid warrant to seize those items—thus making suppression an unavailable remedy for any error that occurred. *Leon*, 468 U.S. at 923.

### III.
### CONCLUSION

Mr. Durham's Motion to Suppress Evidence Obtained During and as a Result of the Obsidian and Fair Finance Searches, [dkt. 152], joined in part by Mr. Cochran and Mr. Snow, is **DENIED**.

05/09/2012

*[signature: Jane Magnus-Stinson]*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Jan M. Carroll
BARNES & THORNBURG LLP
jan.carroll@btlaw.com

Henry Van Dyck
U.S. DEPARTMENT OF JUSTICE
Henry.Van.Dyck@usdoj.gov

Winfield D. Ong
UNITED STATES ATTORNEY'S OFFICE
winfield.ong@usdoj.gov

Robertson Park
U.S. DEPARTMENT OF JUSTICE
Robertson.Park@usdoj.gov

Nicholas E. Surmacz
UNITED STATES ATTORNEY'S OFFICE
nicholas.surmacz@usdoj.gov

John L. Tompkins
BROWN TOMPKINS LORY & MASTRIAN
johnltom@mac.com

Henry Parker Van Dyck
UNITED STATE DEPARTMENT OF JUSTICE
henry.van.dyck@usdoj.gov

Joe Howard Vaughn
UNITED STATES ATTORNEY'S OFFICE
joe.vaughn@usdoj.gov

William H. Dazey , Jr.
INDIANA FEDERAL COMMUNITY DEFENDERS
bill.dazey@fd.org

Jeffrey Allen Baldwin
VOYLES ZAHN PAUL HOGAN & MERRIMAN
jbaldwin@vzplaw.com